**PYMAN S. S. CO., Ltd., v. MEXICAN CENT. RY. CO., Ltd.**

(District Court, S. D. New York. June 25, 1908.)

SHIPPING (§ 178*)—CHARTER PARTY—LIABILITY FOR DEMURRAGE.

> Under a charter party providing that lay days for loading should commence at 6 o'clock A. M. the day after the vessel's report of readiness and that she should load in the customary manner at such wharf as she should be ordered by the charterer's agent, the charterer is liable for demurrage for time lost before she could be provided with a berth after such time commenced, although the delay was not due to any fault of the charterer, but to that of a third party.
>
> [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 585; Dec. Dig. § 178.*]
>
> Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

In Admiralty. Suit for demurrage.

Convers & Kirlin, for libelant.

Frederick R. Swift and Joseph H. Choate, Jr., for respondent.

ADAMS, District Judge. This action was brought by the Pyman Steamship Company, Limited, to recover from the Mexican Central

Railway, Limited, demurrage on the British steamship Dunholme, which, it is alleged, became due by reason of her detention in Philadelphia, from 6 A. M. December 24, 1906, to noon of January 4, 1907, in all 11 days and 6 hours at the charter rate of $213.30, amounting to $2,399.63. The respondent defended this claim on the ground that under the contract and circumstances prevailing in Philadelphia, no demurrage became due.

The contract provided:

" * * * that the said steamer * * * shall * * * proceed to the port of Philadelphia and after discharge of her inward cargo, there load in the customary manner, from the Agents of the Freighters, at such Dock or Wharf as she may be ordered to by Charterers' Agents on arrival, a full and complete cargo consisting of about 5,000 tons of coal. * * *

It is agreed that the days for loading and discharging shall be as follows, commencing at 6 o'clock A. M. on the day after vessel reports and is ready to receive or discharge cargo:—Cargo to be loaded at customary despatch. * * * Demurrage if incurred to be paid by the charterers or their agents at the rate of ten cents United States currency per net registered ton per day except in case of strike, or any other accidents or causes beyond the control of the charterers which may prevent or delay the loading and/or discharging."

It appears that the Dunholme arrived at Philadelphia December 11, 1906, and discharged her inward cargo at the Richmond Piers. She completed her discharge of such cargo on December 16th and at 7 A. M. of the 17th moved out in the river abreast of the wharf where she had discharged. The holds were at the time cleaned up, the hatches were off and the vessel was in a condition to receive cargo. At 11 o'clock A. M. the same day, the captain gave written notice to the charterer's agent in Philadelphia that his vessel was already to receive cargo. The notice in addition to the tender of the vessel pointed out that the lay days would begin December 18th. On December 26th, the master again wrote to the charterer's agent, referring to the letter of the 18th and calling attention to the fact that lay days would expire at 6 A. M. of December 24th, and that the vessel was then two days on demurrage. The charterer's agent acknowledged receipt of this letter and stated that as soon as an available berth presented itself he would notify the vessel's agent.

Although the steamer was always ready to receive cargo under the charter party after the 17th, the respondent did not order her to a loading berth until 3 P. M. on December 31st. During the intervening time, she had been lying abreast of the wharf where she had discharged.

When the vessel received orders it was to proceed to a berth at the Greenwich Piers, but she was detained at her place of anchorage until the next day, when she was towed to the designated loading berth at the Greenwich Piers, 3 or 4 miles from Port Richmond, the place indicated by the charterer. She completed her loading there at noon January 4, 1907.

It is agreed that 1,000 tons per day is the customary rate for loading coal at Philadelphia and 5 days were properly used in loading. The libellant claims that by the terms of the contract lay days began at 6 A.

M. December 18, 1906, and that the charterer is liable for the time between 6 A. M. of December 24, 1906, and noon of January 4, 1907.

The respondent claims that the lay days did not begin to run until the steamer was at the berth to which she was ordered and that, therefore, no demurrage is due.

It further appears that while the vessel was waiting for orders, the master called upon the agent of the respondent in this matter, Mr. William J. Grandfield, at his office in Philadelphia, and was informed by him that his vessel was to be loaded by the Keystone Coal and Coke Company at the piers of the Pennsylvania Railroad Company at Greenwich Point and directed him to take his vessel there as soon as a berth could be obtained. In the port of Philadelphia coal as cargo is never loaded in any other way than through chutes, from which coal contained in railroad cars is dumped directly into the holds of vessels. There are only three places in Philadelphia at which coal in cargo quantities can thus be loaded. Those are the piers of the Pennsylvania Railroad at Greenwich Point, those of the Baltimore & Ohio Railroad Company at Jackson Street, and those of the Philadelphia & Reading Company at Port Richmond. Vessels of the size of the Dunholme cannot be loaded at the Baltimore & Ohio piers at Jackson Street and there are but four berths at which she could be loaded and but one at Port Richmond. These various piers were entirely under the control of the railroad companies, which owned them, and no shipper had any power to control the order in which vessels should be admitted to them, nor to procure a berth for any vessel except as the owners of the piers might permit.

Before the steamer finished discharging her inward cargo, Mr. Grandfield communicated with the officer in charge of the Pennsylvania Railroad piers, who had the power to determine the order in which vessels should receive their berths, notifying him that the Dunholme would require a berth on or about the 17th of December. At the same time he communicated with the Keystone Coal and Coke Company which was to furnish the coal, notifying it that the cargo would be required and requested it to do what it could to hurry the procuring of a berth for this steamer. On December 17th, the captain of the steamer, notified Mr. Grandfield that his vessel had completed the discharge of her cargo and Mr. Grandfield immediately applied again to the superintendent of the Pennsylvania piers for a berth and from that time until one was actually procured, he made persistent attempts to accomplish that result. During the same time an officer of the Keystone applied frequently for a berth, stating that the cargo was ready, as it actually was.

In spite, however, of all these efforts, no berth was procured for the steamer until about 3 o'clock of December 31st, when she was notified that a berth was ready for her and she moved into it on the following morning. She was then duly loaded.

The respondent seems to have done all it could to expedite the loading. The cause of the delay was the failure of the Pennsylvania Railroad Company to give the vessel proper despatch. While there was an obligation on the vessel's part to load in the customary manner, that evidently referred to the method of loading by chutes, not to the

time of waiting for a berth. The contract provided that the days for loading should commence at 6 o'clock A. M. on the day after the vessel reported and was ready to receive cargo. This vessel reported on the 17th of December, and was ready for a berth on the following morning. She did not receive a berth for several days because the railroad company's berths were occupied and she, therefore, had to wait. This should not be at the expense of the vessel, but of the charterer under the contract.

There will be a decree for the libellant for $2,399.63 with interest.